UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

LUIS DELGADO; JUAN FEDERICO
LESSMANN; SCH CONSULTING, INC.;
TRUEGOLD CORPORATION; SUREGOLD
CORPORATION; and COLLECTGOLD
CORPORATION,

       Plaintiffs,

vs.                                                                     **JURY TRIAL DEMANDED**

GOLDEN EYE RESOURCES, LLC;
DONALD RUTLEDGE; LESLIE
RUTLEDGE; and DANIEL MATOS
ROMERO,

       Defendants,

_____/

## COMPLAINT

Plaintiffs, LUIS DELGADO; JUAN FEDERICO LESSMANN; SCH CONSULTING, INC.; TRUEGOLD CORPORATION; SUREGOLD CORPORATION; and COLLECTGOLD CORPORATION (collectively, "**Plaintiffs**"), by and through their undersigned counsel, hereby sue Defendants, GOLDEN EYE RESOURCES, LLC; DONALD RUTLEDGE; LESLIE RUTLEDGE; and DANIEL MATOS ROMERO (collectively, "**Defendants**"), and allege as follows:

## THE PARTIES, JURISDICTION AND VENUE

1.     Plaintiff LUIS DELGADO ("**Delgado**") is an individual residing in New York, New York and is otherwise *sui juris.*

2.     Plaintiff JUAN FEDERICO LESSMANN ("**Lessman**") is an individual residing in Huntington, New York and is otherwise *sui juris.*

1

3.      Plaintiff SCH CONSULTING, INC. ("**SCH**") is a Panama company with its principal place of business located in the Republic of Panama.

4.      Plaintiff TRUEGOLD CORPORATION ("**Truegold**") is a British Virgin Islands company with its principal place of business located in Road Town, Tortola, British Virgin Islands. Truegold is owned and controlled by Fernando Espejo.

5.      Plaintiff SUREGOLD CORPORATION ("**Suregold**") is a British Virgin Islands company with its principal place of business located in Road Town, Tortola, British Virgin Islands. Suregold is owned and controlled by Gustavo Espejo.

6.      Plaintiff COLLECTGOLD CORPORATION ("**Collectgold**") is a British Virgin Islands company with its principal place of business located in Road Town, Tortola, British Virgin Islands. Collectgold is owned and controlled by Jacobo Toledano.

7.      Defendant GOLDEN EYE RESOURCES, LLC ("**Golden Eye**") is a Nevada limited liability company with its primary place of business located at 1111 E. Katella Avenue, Orange, California 92867.

8.      Defendant DONALD RUTLEDGE is, upon information and belief, an individual residing in Vancouver, Canada and is otherwise *sui juris*.

9.      Defendant LESLIE RUTLEDGE is, upon information and belief, an individual residing in Vancouver, Canada and is otherwise *sui juris*.

10.     Defendant DANIEL MATOS ROMERO ("**Matos**") is an individual residing in Boca Raton, Florida and is otherwise *sui juris*.

11.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332 and 1367, because (i) the matter in controversy exceeds the sum or value of

2

$75,000.00, exclusive of interest and costs, and is between citizens of different states and/or foreign states; (ii) the action arises, in part, under the laws of the Unites States; and (iii) Plaintiffs' state law claims arise out of the same case or controversy, with a common nucleus of operative facts, as the federal law claims.

12.    This Court has personal jurisdiction over Golden Eye, Donald Rutledge, Leslie Rutledge and Matos because they conducted business, and engaged in acts of fraud against Plaintiffs, in Miami-Dade County, Florida. In addition, this Court also has personal jurisdiction over Matos because he resides in Palm Beach County, Florida.

13.    Venue is proper in the United Stated District Court for the Southern District of Florida under 28 U.S.C. § 1391(b)(2)-(3) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here (including numerous meetings between Plaintiffs and Defendants in Miami, Florida during which many of the fraudulent statements at issue were made) and because Defendants are subject to personal jurisdiction with respect to this action here.

## **GENERAL ALLEGATIONS**

14.    Golden Eye was formed in or about November 2013.

15.    The managers of Golden Eye included Donald Rutledge and Daniel Matos.

16.    According to Golden Eye's Operating Agreement, the purported business of Golden Eye was to be, among other things, "[t]o purchase and acquire various mining claims and associated interests, worldwide, and/or conduct mining operations." *See* Golden Eye Operating Agreement, a true and correct copy of which is attached hereto as **Exhibit "A"**.

3

## The February 2014 Asset Purchase Agreement with the Moen Group

17.     On or about February 6, 2014, Golden Eye entered into an Asset Purchase Agreement (the "**APA**") with RAM Resources, LLC ("**RAM**"), as purchaser, and the Moen Family Trust (the "**Moen Trust**"), M&W Milling and Refining, Inc. ("**MWMR**"), and Moen Builders, Inc. ("**Moen Builders**") (collectively, the "**Moen Group**"), as sellers, pursuant to which RAM agreed to purchase certain mining assets from the Moen Group for a total sum of $25 million (the "**Cash Payment**"). *See* February 6, 2014 APA, a true and correct copy of which is attached hereto as **Exhibit "B"**.

18.     The mining assets that RAM was allegedly to purchase from the Moen Group pursuant to the APA allegedly included patented and unpatented mining claims and mill sites (collectively, the "**Property**"), milling facilities, furnaces, production, facilities, buildings, ponds, inventories, machinery, equipment, contracts, permits, plans, reports, data, surveys, logs, documents and other tangible and intangible property and other assets located in the area of Virginia City, Montana (collectively, the "**Mining Assets**") (the Property and Mining Assets hereinafter collectively referred to as the "**Alder Gulch Mining Site**") . *See* APA, Ex. B.

19.     The APA represented that the total acreage of the Moen Group's patented and unpatented claims was approximately 6,500 acres.  *See* APA, Ex. B, at § 1.2.

20.     The APA provided for Golden Eye to establish the purchaser, RAM, with the sellers, the Moen Group, prior to the effective date of the APA, with Golden Eye to have an 85% ownership interest in RAM, the Moen Group to have a 10% ownership interest, and Roy Mathew Moen ("**Matt Moen**") to have a 5% ownership interest. *See* APA, Ex. B, at § 3.1.

4

21.     The APA provided that neither the Moen Group nor Matt Moen had any obligation to pay any capital calls or make any capital contribution to RAM to acquire or maintain their respective membership interests. *See* APA, Ex. B, at § 3.4. Golden Eye, on the other hand, was required to invest a minimum of $42.2 million in RAM to satisfy RAM's obligations under the APA. *Id.*

22.     In addition to the $25 million Cash Payment (to be paid entirely by Golden Eye), the APA also required RAM to invest a minimum of $17.2 million as a work commitment, in the alleged development and production of minerals on the Property including funding operations on the Property, to be paid by Golden Eye in $500,000 monthly installments beginning on February 28, 2014, as well as in other advance payments totaling approximately $5 million for development work on one of the mines being purchased, the Easton mine (collectively, the "**Development Payments**"). *See* APA, Ex. B, at Article V.

23.     The Moen Group and Golden Eye agreed that the revenue generated from the operation of the Moen Group's mill would be used to pay the operating expenses of the mill and necessary improvements thereto, with RAM's 85% share of any remaining revenue to be paid to the Moen Group and applied first to certain loan interest and then to RAM's / Golden Eye's installment payments owed on the $25 million purchase price.  *See* APA, Ex. B, at Article V.

24.     Golden Eye also agreed that, if it were to default on its payment obligations under the APA and fail to cure such default, the Moen Group would have the right to terminate the APA while retaining (i) all payments made by Golden Eye to date and (ii) ownership of the Alder Gulch Mining Site and its assets. *See* APA, Ex. B, at Article XIII.

**<u>Defendants Fraudulently Induced Plaintiffs To Invest Over $8 Million In</u>**
**<u>Golden Eye and the Moen Group's Property and Mining Assets</u>**

25.     Between February 2014 and April, 2018, Defendants induced Plaintiffs to invest

over $8 million in Golden Eye and the Alder Gulch Mining Site project, which investments are

broken down as follows:

- Luis Delgado invested a total of $5,095,000 between February 2014 and September 2016.

- Juan Lessmann invested a total of $1,450,000 between March 2017 and July 2018.

- SCH invested a total of $500,000 on or about July 31, 2014.

- Truegold invested a total of $400,000 on or about August 8, 2014.

- Suregold invested a total of $400,000 on or about August 8, 2014.

- Collectgold invested a total of $400,000 on or about August 8, 2014.

26.     Defendants Donald Rutledge, Leslie Rutledge and Daniel Matos induced

Plaintiffs to invest the foregoing amounts in Golden Eye and the Alder Gulch Mining Site

project by making the following representations to Plaintiffs during numerous telephone calls

and in-person meetings between the parties in South Florida, Caracas, Venezuela and Virginia

City, Montana from early 2014 through early 2018 (including meetings in Miami, Florida and

Coral Gables, Florida on or about May 29, 2014; July 14, 2014; December 16, 2014; March 27,

2015; and August 7, 2015, among others):

(a)     Donald Rutledge and Leslie Rutledge represented that they had loaned to,

or invested in, Golden Eye and/or the Alder Gulch Mining Site project a substantial sum

of their own money (e.g., $15 million) to finance Golden Eye and the purchase of the

Moen Group's Property and Mining Assets from the Moen Group.

6

(b)     Daniel Matos also represented that he had loaned to, or invested in, Golden Eye and/or the Alder Gulch Mining Site project a substantial sum of money to finance Golden Eye and the purchase of the Moen Group's Property and Mining Assets from the Moen Group.

(c)     Defendants represented that Donald Rutledge and Matos had been business partners for 30 years or so, and that Donald Rutledge had many years of experience in the gold business.

(d)     Defendants represented that, in total, the Alder Gulch Mining Site had reserves of 20 million ounces of gold.

(e)     Defendants represented that there were currently enough gold and silver reserves at the Alder Gulch Mining Site that could be exploited right away (using Plaintiffs' investment funds) and generate sufficient profit so as to cover all of Golden Eye's remaining required payments under the APA.

(f)     Defendants represented that all of the moneys that Plaintiffs were loaning to, or investing in, Golden Eye would be used to make the initial Cash Payments and Development Payments owed by Golden Eye to the Moen Group under the APA.

(g)     Defendants represented that all of the moneys that Plaintiffs had previously invested in, or loaned to, Golden Eye had been used to make the initial Cash Payments and Development Payments owed by Golden Eye to the Moen Group under the APA.

7

(h)     Defendants represented that that certain work had already been done at the Moen Group's Property and with respect to the Moen Group's Mining Assets, including that the mill at the Property had been "totally refurbished".

(i)     Defendants represented that RAM had existing contracts with certain third parties for the delivery of low-grade ore, which contracts were generating substantial profits for RAM and Golden Eye.

27.     Upon information and belief, each of the foregoing representations made by Defendants Donald Rutledge, Leslie Rutledge and Daniel Matos was false and misleading when made:

(a)      Donald Rutledge and Leslie Rutledge had not loaned to, or invested in, Golden Eye and/or the Alder Gulch Mining Site project a substantial sum of money to finance Golden Eye and the purchase of the Moen Group's Property and Mining Assets from the Moen Group.

(b)     Daniel Matos had also not loaned to, or invested in, Golden Eye and/or the Alder Gulch Mining Site project a substantial sum of money to finance Golden Eye and the purchase of the Moen Group's Property and Mining Assets from the Moen Group.

(c)     Donald Rutledge and Matos had not been business partners for 30 years or so, and Donald Rutledge did not have many years of experience in the gold business.

(d)     The Alder Gulch Mining Site did not have reserves of 20 million ounces of gold.

(e)     There was not currently enough gold and silver reserves at the Alder Gulch Mining Site that could be exploited right away (using Plaintiffs' investment funds)

8

and generate sufficient profit so as to cover all of Golden Eye's remaining required payments under the APA.

(f)     All of the moneys that Plaintiffs loaned to, or invested in, Golden Eye was not used to make the initial Cash Payments and Development Payments owed by Golden Eye to the Moen Group under the APA (but instead, upon information and belief, Defendants retained some or all of the moneys for themselves).

(g)     The work that Defendants had represented had already been done at the Moen Group's Property and with respect to the Moen Group's Mining Assets had not actually been done, including that the mill at the Property had not been "totally refurbished".

(h)     RAM did not have existing contracts with certain third parties for the delivery of low-grade ore that were generating substantial profits for RAM and Golden Eye.

28.     In addition, Defendants also made false and misleading statements to Plaintiffs in email correspondence and other documents. For example, in an April 23, 2014 email, Donald Rutledge made the following representations to one of the Plaintiffs which, upon information and belief, were false and misleading when made:

(a)     "Over the last 25 years I was instrumental in 5 major mines going into production."

(b)     "Daniel [Matos] invested in this opportunity a couple of years ago."

9

(c)     "Between us we have further developed the Alder Gulch assets to now be worth over $196,000,000. This value does not include the gold and silver that exists on this extensive property. … Potentially over 20 million ounces of gold."

(d)     "[W]e have kept our operation working. We have stock piled Gold and Silver ore ready to start production."

(e)     "We have totally refurbished our 250 tons per day fully permitted mill. In a test we operated at 10 – 14 tons per hour, 24 hours a day."

(f)     "[Golden Eye] warrants that they have mining technical equipment on the property and property improvements with a value of approximately $196,000,000 (One Hundred and Ninety Six Million) dollars."[1]

29.     Perhaps most egregiously, Defendants led Plaintiffs to believe that this was a brand new investment opportunity that Donald Rutledge had first learned about by chance after meeting one of the Moens in a bar in Montana.

30.     However, the truth was that a broker, Christian Brule, had introduced the Alder Gulch Mining Site opportunity to Donald Rutledge in or about August 2010 and Plaintiffs were at least the second group of investors whom Donald Rutledge had convinced to invest in the Alder Gulch Mining Site project, in a deal that was essentially the same as the one in which Plaintiffs had invested -- where the prior investors had also had a $25 million asset purchase agreement with the Moens and had been required to invest another $20.5 million into mine development.  And, like Plaintiffs, the prior group of investors had paid approximately $4.9

---

[1] This warranty by Defendants was set forth in the proposed Memorandum of Understanding (MOU) attached to Donald Rutledge's April 23, 2014 email to one of Plaintiffs and is consistent with Donald Rutledge's statement that the Alder Gulch Mining Site had a value of $196 million, without taking into account the gold and silver on the property.

SHUTTS.COM  |  FORT LAUDERDALE  |  MIAMI  |  ORLANDO  |  SARASOTA  |  TALLAHASSEE  |  TAMPA  |  WEST PALM BEACH
MIADOCS 25065109 3

million into the project before the deal collapsed in or about May 2013 and their entire investment was lost.

31.     Had Plaintiffs been advised of this truth by Defendants, that there had been a prior investment group that had lost approximately $4.9 million on the very same Alder Gulch Mining Site project just a year earlier, Plaintiffs never would have invested in the project themselves.

32.     But Plaintiffs were not told the truth by Defendants. Rather, contrary to Defendants' false and misleading representations, the entire Alder Gulch Mining Site project was a scam orchestrated and/or maintained by Donald Rutledge, his wife Leslie Rutledge and Daniel Matos in order to defraud Plaintiffs and others out of millions of dollars (for at least the second time). The mining technical equipment on the Alder Gulch property and property improvements were not worth anywhere near $196,000,000; there were no proven reserves that could be immediately exploited; the mill had not been "totally refurbished"; RAM did not have existing contracts with certain third parties for the delivery of low grade ore.

### The June 2014 Amendment to the Asset Purchase Agreement

33.     On or about June 26, 2014, following Golden Eye's failure to make the required payments under the APA, RAM, Golden Eye and the Moen Group entered into an Amendment to the Asset Purchase Agreement (the "**APA Amendment**"), pursuant to the parties agreed to, among other things, a modification of the payment schedules for the Cash Payment and Development Payments.  *See* June 26, 2014 APA Amendment, a true and correct copy of which is attached hereto as **Exhibit "C"**.

11

**The March 2015 Investor Meeting in Miami, Florida**

34.     In order to hide the truth from Plaintiffs and other investors (i.e., that the project was a scam) and convince them to continue investing in the Alder Gulch Mining Site project, Donald Rutledge and Daniel Matos met with Plaintiffs and other investors in Miami, at 1331 Brickell Bay Drive, on March 27, 2015. During this meeting, Donald Rutledge made the following representations to Plaintiffs, which, upon information and belief, were false and misleading when made:

- Production at the Prospect. A recent engineering drawing of the underground sections of the Prospect site was reviewed and showed a newly identified high grade zone. Golden Eye was planning to begin production at this location in mid-April, starting at 100 tons per day.

- Easton Underground Mine. Preliminary work was being done at the entrance of the Easton Underground Mine in preparation for refurbishment of the tunnel.  The permitting is in the process of being completed, and the plan is to begin extensive work on the tunnel in early April.

- Golden Sunlight. "Golden Sunlight has requested 60 loads per day. We are presently completing assays that will have Golden Sunlight's approval for extensive shipments from the Easton dumps. This will allow initial shipments of 15 loads per day. The plan is to increase production to 30 loads per day once we have created a continuous low grade supply from the Prospect and the Pacific. When we are in production at the Easton, we will have enough low grade material to increase to 60 loads per day. This is targeted for the 1st of July."

- Financing: "Thanks to Nomar's [Tavio] financing, over the last few weeks we have completed the final work on the mill. It is now 100% ready for production. Also, we completed the extension to the Prospect and are blasting out ore every day. We upgraded the road to the Easton in preparation to remove the Easton dumps. We have now ordered and paid for all of the equipment needed for the Prospect."

  When asked what would be the least amount required to go into production from the Prospect, Pacific and Easton locations, Donald Rutledge represented that $2 million could do it "bare bones", though he would have Apex and Matt Moen clarify the amount. Nomar Tavio

12

then suggested that the current investors provide the additional $2 million funding.

*See* copy of Minutes of March 17, 2015 Meeting, a true and correct copy of which is attached hereto as **Exhibit "D"**.

## **The Alder Gulch Combined Balance Sheets and Asset Evaluation**

35.     Following the March 2015 meeting in Miami, and continuing throughout the time that Defendants were fraudulently inducing Plaintiffs to invest in Golden Eye and the Alder Gulch Mining Site project, Defendants provided Plaintiffs with several Combined Balance Sheets of RAM and Golden Eye during years 2015, 2016 and 2017, each of which represented to Plaintiffs the following:

(a)  The Alder Gulch Mining Site's ore inventory was worth $32.5 million.

(b)  The Alder Gulch Mining Site's Property was worth over $25 million.

(c)  The Alder Gulch Mining Site's plant and equipment were worth over $60 million.

(d)  The Alder Gulch Mining Site's roads were worth $12.75 million.

(e)  The value of the investors' equity in the Alder Gulch Mining Site and its assets was in excess of $172 million.

*See* copies of June 1, 2015, September 30, 2016 and December 31, 2017 Alder Gulch Combined Balance Sheets, true and correct copes of which is attached collectively hereto as **Composite Exhibit "E"**.

36.     In addition, Defendants also provided Plaintiffs with a valuation of the Alder Gulch Mining Site's assets as of December 31, 2015 that represented that such assets were worth in excess of $213 million.  *See* Alder Gulch Asset Evaluation – December 31, 2015, a true and correct copy of which is attached hereto as **Exhibit "F"**.

13

37.     Upon information and belief, the foregoing representations regarding the financial status of the Alder Gulch Mining Site project and the value of its assets were known to be false and misleading when made.

### The June 2016 Bridge Agreement and September 2016 Amendment Thereto

38.     On or about June 28, 2016, after Golden Eye had again failed to comply with its obligations under the APA and Amendment thereto, Golden Eye, RAM and the Moen Group entered into a Bridge Agreement (the "**Bridge Agreement**"), pursuant to which the parties further modified the APA and agreed to, among other things, the following: (i) RAM and Golden Eye would fund certain work on the Easton Mine, and (ii) Golden Eye would make certain payments to the Moen Group to bring the APA payment schedule current. *See* June 28, 2016 Bridge Amendment, a true and correct copy of which is attached hereto as **Exhibit "G"**.

39.     Shortly thereafter, on or about September 26, 2016, Golden Eye, RAM and the Moen Group entered into an Amendment to the Bridge Agreement (the "**Bridge Amendment**"), pursuant to which the parties modified the Bridge Agreement and agreed to, among other things, the following: (i) RAM and Golden Eye would fund certain work relating to the Pacific Pit and the Alder Gulch Mill, and (ii) RAM would make certain payments to the Moen Group due and owing under the APA. *See* September 26, 2016 Bridge Amendment, a true and correct copy of which is attached hereto as **Exhibit "H"**.

### The Moen Group's Termination of the APA
### in November 2018 Due to Golden Eye's Payment Defaults

40.     Contrary to the representations Defendants made to Plaintiffs regarding the Alder Gulch Mining Site assets and the project's alleged ongoing viability, the project failed.

14

41.     On or about August 29, 2018, the Moen Group, through counsel, sent a letter to Golden Eye and RAM (the "**Default Letter**") notifying them that they were in default under the APA, having failed to make various payments due and owing under the APA and amendments thereto, and advising them that, if the payment defaults were not cured within fifteen days, the Moen Group would exercise its remedies under the APA including accelerating the entire unpaid balances of the Cash Payment and Development Payments. *See* August 29, 2018 Default Letter, a true and correct copy of which is attached hereto as **Exhibit "I"**.

42.     Defendants did not cause Golden Eye or RAM to cure the payment defaults or provide Plaintiffs with notice of the Default Letter until well after the 15-day cure period had already expired.

43.     On or about September 14, 2018, the Moen Group, through counsel, sent a letter to Golden Eye and RAM (the "**Acceleration Letter**") notifying them that the Moen Group had elected to accelerate, among other things, the entire unpaid balances of the Cash Payment (in the amount of $23.2 million) and the Development Payments (in an amount in excess of $12.3 million), and advising them that, if the foregoing accelerated amounts were not paid within thirty days, the Moen Group would immediately terminate the APA. *See* September 14, 2018 Acceleration Letter, a true and correct copy of which is attached hereto as **Exhibit "J"**.

44.     Defendants did not cause Golden Eye or RAM to pay the accelerated amounts due or provide Plaintiffs with notice of the September 14, 2018 Acceleration Letter prior to the expiration of the 30-day deadline for such payments.

45.     Instead, at the time, Defendants were continuing to represent to Plaintiffs that Golden Eye and the Alder Gulch Mining Site project were viable, and even convinced Lessman

SHUTTS.COM   |   FORT LAUDERDALE   |   MIAMI   |   ORLANDO   |   SARASOTA   |   TALLAHASSEE   |   TAMPA   |   WEST PALM BEACH
MIADOCS 25065109 3

to enter into a Private Placement Conversion Agreement on or about September 24, 2018 pursuant to which Lessman converted his substantial loans to Golden Eye into a 5% ownership interest in Golden Eye. *See* September 24, 2018 Private Placement Conversion Agreement, a true and correct copy of which is attached hereto as **Exhibit "K"**.

46.    Shortly thereafter, on or about November 2, 2018, the Moen Group, through counsel, sent a letter to Golden Eye and RAM (the "**Termination Letter**") notifying them that the Moen Group had elected to terminate the APA due to Golden Eye's and RAM's failure to cure their payment defaults. *See* November 2, 2018 Termination Letter, a true and correct copy of which is attached hereto as **Exhibit "L"**.

47.    As a result of the Moen Group's termination of the APA, Plaintiffs' investments in Golden Eye and the Alder Gulch Mining Site project were rendered entirely worthless.

**After the Default, Defendants Have Continued to Make False Representations
Regarding the Project and Promises of Repayment of Plaintiffs' Investments
In Order To Perpetuate Their Fraud Against Plaintiffs and Other Investors**

48.    After the termination of the APA and continuing into 2022 in an effort to hide from Plaintiffs (and other investors) the fact that the Alder Gulch Mining Site project is a scam, Defendants have continued both to make false representations to Plaintiffs and their agents regarding the ongoing viability of the Alder Gulch Mining Site project and to promise Plaintiffs that their investments would eventually be repaid by bringing in new investors and/or lenders to fund the project.

49.    For example, on November 12, 2021, Defendants represented to Plaintiffs that they are about to obtain financing from a new financing group, and, once that financing was obtained, the Alder Gulch Mining Site project would go into production and Plaintiffs'

16

investments would be repaid. *See* November 12, 2021 Letter from Michael DeBenon to Plaintiffs' counsel, a true and correct copy of which is attached hereto as **Exhibit "M"**.

50.    Defendants have been making these same types of false representations to Plaintiffs for years, telling Plaintiffs that they were just about to get financing from other investors that was sufficient to finally have the Alder Gulch Mining Site project go into production and generate income to pay back Plaintiffs and even give them a return on their investment.  But no such financing has ever materialized, nor will it.

51.    Plaintiffs believed Defendants' ongoing false representations regarding the viability of the Alder Gulch Mining Site project and relied on same as being true.

52.    But Defendants' Alder Gulch Mining Site project is and has always been a scam.

**Plaintiffs' Discovery that Defendants' Alder Gulch Mining Site Project Was A Scam**

53.    Plaintiffs were first able to determine that Defendants' Alder Gulch Mining Site project was a scam in November 2020, when Plaintiffs provided Defendants with a copy of a February 15, 2017 Technical Report on the Alder Gulch property (which they had not previously shared with Plaintiffs) that showed, contrary to Defendants' repeated representations, that there were no proven reserves of gold and silver at the site and the only area at the property that could produce ore in short order was an open pit (which in the intervening years since 2017 had already been exploited and produced no substantial revenue or profits).

54.    All conditions precedent to the maintenance of this action have been satisfied, have been waived or have been made impossible by Defendants' actions. Further, Defendants are barred, in equity, from the assertion of any failure of any conditions precedent.

17

## COUNT I: FRAUD

55.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 54 of the Complaint, as if fully set forth in this Count.

56.     As set forth in the General Allegations section of this Complaint, Defendants made numerous misrepresentations to Plaintiffs regarding the Alder Gulch Mining Site project and its assets, financial performance, investors, and viability.

57.     Defendants knew that these misrepresentations regarding the Alder Gulch Mining Site project were false and that the project itself was nothing more than a scam to bilk Plaintiffs and other investors out of millions of dollars.

58.     Defendants intended that their misrepresentations regarding the Alder Gulch Mining Site project would induce Plaintiffs to rely and act on such misrepresentations.

59.     Plaintiffs did rely and act on Defendants' misrepresentations regarding the Alder Gulch Mining Site project by investing millions of dollars in the project.

60.     Plaintiffs suffered substantial damages in excess of $5 million in justifiable reliance on Defendants' misrepresentations regarding the Alder Gulch Mining Site project.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages, punitive damages, pre- and post-judgment interest, and any other relief this Court deems just and proper.

## COUNT II: CONSPIRACY TO COMMIT FRAUD

61.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 54 of the Complaint, as if fully set forth in this Count.

62.     There was an agreement between Defendants to defraud Plaintiffs and other investors out of millions of dollars by purposefully making false and misleading representations

SHUTTS.COM   |   FORT LAUDERDALE   |   MIAMI   |   ORLANDO   |   SARASOTA   |   TALLAHASSEE   |   TAMPA   |   WEST PALM BEACH
MIADOCS 25065109 3

to Plaintiffs and other investors regarding the Alder Gulch Mining Site project and its assets, financial performance, investors, and viability.

63.     In furtherance of this conspiracy and as set forth in the General Allegations section of this Complaint, each of Defendants made numerous false and misleading representations to Plaintiffs regarding the Alder Gulch Mining Site project and its assets, financial performance, investors, and viability.

64.     Defendants knew that their misrepresentations regarding the Alder Gulch Mining Site project were false and that the project itself was nothing more than a scam to bilk Plaintiffs and other investors out of millions of dollars.

65.     Defendants intended that their misrepresentations regarding the Alder Gulch Mining Site project would induce Plaintiffs to rely and act on such misrepresentations.

66.     Plaintiffs did rely and act on Defendants' misrepresentations regarding the Alder Gulch Mining Site project by investing millions of dollars in the project.

67.     Plaintiffs suffered substantial damages in excess of $5 million in justifiable reliance on Defendants' misrepresentations regarding the Alder Gulch Mining Site project.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages, punitive damages, pre- and post-judgment interest, and any other relief this Court deems just and proper.

### COUNT III: VIOLATIONS OF FEDERAL RICO ACT, 18 U.S.C. § 1962(c)

68.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 54 of the Complaint, as if fully set forth in this Count.

69.     As described below, Defendants violated 18 U.S.C. § 1962(c).

19

70.     Defendants are persons within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

71.     Donald Rutledge, Leslie Rutledge and Daniel Matos are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise (hereinafter referred to as the "**Alder Gulch Scheme**") to obtain money and property from Plaintiffs and various other investors and/or financial institutions by means of false or fraudulent pretenses and representations.  As such, they are part of, and associated with, an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

72.     In furtherance of the Alder Gulch Scheme, Defendants (i) caused funds to be transmitted by Plaintiffs and other investors by means of wire in interstate or foreign commerce, and (ii) made numerous misrepresentations to Plaintiffs and other investors regarding the Alder Gulch Mining Site assets and the project's alleged ongoing viability over the wires by both phone and electronic mail.  Based on the foregoing activity, Defendants' Alder Gulch Scheme engaged in, or its activities affected, interstate or foreign commerce within the meaning of 18 U.S.C. § 1962(c).

73.     Defendants were each employed by or associated with the Alder Gulch Scheme.

74.     Each of Defendants conducted or participated, either directly or indirectly, in the conduct, management or operation of the affairs of the Alder Gulch Scheme through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).  For example, each of Defendants committed multiple acts of wire fraud in violation of 18 U.S.C. § 1343 by fraudulently causing Plaintiffs to make numerous investments in Golden Eye and the Alder Gulch Mining Site despite Defendants' knowledge that such investments would not be profitable.

20

75.     Each of Defendants committed a substantial number of related predicate acts all in furtherance of the goals of the Alder Gulch Scheme over an extended and continuous period of time from 2014 through 2022.

76.      Plaintiffs were injured by reason of Defendants' violations of 18 U.S.C. § 1962(c) and their predicate acts.  These injuries included the loss of their entire investments in Golden Eye and the Alder Gulch Mining Site.

77.     Plaintiffs' injuries were a direct, proximate and reasonably foreseeable result of the Defendants' violations of 18 U.S.C. § 1962(c) and their predicate acts.

WHEREFORE, pursuant to 18 U.S.C. § 1964(c), Plaintiffs demand judgment against Defendants, jointly and severally, for treble damages, their attorney's fees and court costs incurred in this action, and any other relief this Court deems just and proper.

## COUNT IV: VIOLATIONS OF FEDERAL RICO ACT, 18 U.S.C. § 1962(d)

78.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 54 and 73 through 82 of the Complaint, as if fully set forth in this Count.

79.     Defendants violated 18 U.S.C. § 1962(d) by conspiring together to violate 18 U.S.C. § 1962(c).

80.     In connect with the Alder Gulch Scheme, Defendants each agreed and conspired together to accomplish an unlawful plan to engage in a pattern of racketeering activity and defraud Plaintiffs and other investors out of millions of dollars.  Among other things, Defendants each agreed to the overall objective of the conspiracy, or agreed to commit personally at least two acts of racketeering, including but not limited to the predicate acts described in ¶¶ 27-38, above.

21

81.     As a direct and proximate result of the predicate acts taken by Defendants in furtherance of the conspiracy, Plaintiffs have been injured in their business or property.

WHEREFORE, pursuant to 18 U.S.C. § 1964(c), Plaintiffs demand judgment against Defendants, jointly and severally, for treble damages, their attorney's fees and court costs incurred in this action, and any other relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues raised in the Complaint.

**SHUTTS & BOWEN LLP**
*Attorneys for Plaintiffs*
200 South Biscayne Boulevard
Suite 4100
Miami, Florida 33131
Tel: 305-415-9436
Fax: 305-415-9836
E-mail: Jbustard@shutts.com


By: *John W. Bustard, Esq.*
Geoffrey Travis, Esq.
Florida Bar No. 988812
John W. Bustard, Esq.
Florida Bar No. 641871

SHUTTS.COM   |   FORT LAUDERDALE   |   MIAMI   |   ORLANDO   |   SARASOTA   |   TALLAHASSEE   |   TAMPA   |   WEST PALM BEACH
MIADOCS 25065109 3